## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NICK AGAPOV<br>ANTHONY J. BROOKE<br>MATTHEW COTILLO<br>KYLE COOK-SPICER<br>BRANDON FARLEY<br>CHRIS HALL<br>JONATHAN HASKETT<br>JOSHUA HITCHENS<br>JAMES LUBONSKI<br>JOHN MCINTOSH<br>MATTHEW OBORDO<br>MICHAEL O'CONNELL<br>CHRISTOPHER OLIVER<br>TRAVIS POPIELARCHECK<br><br>     PLAINTIFFS,<br>v.<br><br>PRINCE GEORGE'S COUNTY,<br>MARYLAND<br>PRINCE GEORGE'S COUNTY POLICE<br>DEPARTMENT<br>CLEO SAVOY<br>DAVID ROBINSON<br>JAMES McCREARY<br>MICHAEL ELSER<br>MALIK AZIZ<br>VERNON HALE<br>ROBERT BLACK<br>AMIR CANELA<br>ANGELA ALSOBROOKS<br>BARRY STANTON<br>DONNELL TURNER<br>COREY TRUXON<br>JEFF ROSS<br>ROBERT HARVIN JR.<br><br>     DEFENDANTS. | CIVIL ACTION No.: 8:23-CV-03191<br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiffs, by and through their attorney, Ray M. Shepard and The Shepard Law Firm and pursuant to the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. §§ 1983 and 1988, Articles 24, 26, and 40 of the Maryland Declaration of Rights, and the common law, does hereby sue the Defendants for declaratory and injunctive relief and for damages arising from violations of their rights guaranteed by the United States Constitution, the Maryland Declaration of Rights, and the common law of Maryland.  In support of their causes of action, Plaintiffs allege as follows:

## PARTIES

1.      Plaintiffs  Nick Agapov, Anthony J. Brooke, Matthew Cotillo, Kyle Cook-Spicer, Brandon Farley, Chris Hall, Jonathan Haskett, Joshua Hitchens, James Lubonski, John McIntosh, Matthew Obordo, Michael O'Connell, Christopher Oliver, and Travis Popielarcheck (the "Plaintiffs") are all citizens of the United States.   The Plaintiffs were at all relevant times police officers or former police officers in the PGPD employed by Prince George's County, Maryland. All Plaintiffs were assigned to the Special Assignment Team and all received outstanding performance appraisals prior to the events alleged herein.

2.       Defendant Prince George's County ("PG County") is a municipal corporation and body politic located in PG County, Maryland.  Pursuant to the PG County Charter, § 101, PG County has all rights and powers of local self-government and home rule. PG County maintains and operates a police force, known as the PGPD ("PGPD").  Police officers with the PGPD are employees of PG County.  PG County has *respondeat superior* liability for Plaintiffs' State Constitutional claims.  Defendant PGPD is the police force maintained and operated by PG County.

2

3.      Defendant Cleo Savoy was at all relevant times a police officer in the PGPD.  Savoy served as an investigating officer with the Internal Affairs division of the PGPD. Savoy retired from the police department after the events alleged in this Complaint.  Savoy is sued individually and in her official capacity as an officer within the police department.

4.      Defendant David Robinson was at all relevant times a police officer in the PGPD. Robinson served as the Assistant Commanding Officer within the Internal Affairs division of the police department. Robinson retired from the police department after the events alleged in this Complaint.  Robinson is sued individually and in his official capacity as an officer within the police department.

5.      Defendant James McCreary was at all relevant times a police officer in the PGPD. McCreary served as the Commanding Officer within the Internal Affairs division of the police department.   McCreary has been promoted to Deputy Chief of Police.   McCreary is sued individually and in his official capacity as an officer within the police department.

6.      Defendant Michael Elser was at all relevant times a police officer in the PGPD. Elser is an investigating officer within the Internal Affairs division of the police department. Elser is sued individually and in his official capacity as an officer within the police department.

7.      Defendant Malik Aziz is the Chief of Police in the PGPD.  Aziz is the ultimate approval authority within the police department for disciplinary actions. Aziz is sued individually and in his official capacity as an officer within the police department.

8.      Defendant Vernon Hale is the Assistant Chief of Police in the PGPD.  As Assistant Chief, Hale oversees operations in the Internal Affairs division of the police department. Hale is sued individually and in his official capacity as an officer within the police department.

9.      Defendant Robert Black was at all relevant times a police officer in the PGPD. Black was a supervising officer within the Internal Affairs division of the police department. Black retired from the police department after the events alleged in this Complaint. Black is sued individually and in his official capacity as an officer within the police department.

10.      Defendant Amir Canela was at all relevant times a police officer in the PGPD. Canela was an investigating officer within the Internal Affairs division of the police department. Canela has since been promoted to the rank of Lieutenant and transferred from the Internal Affairs division. Canela is sued individually and in his official capacity as an officer within the police department.

11.      Defendant Angela Alsobrooks is the PG County Executive.  Alsobrooks directed that the cases of officer discipline involving the Plaintiffs within the PGPD be approved by her and/or her office.  Alsobrooks is sued individually and in her official capacity as the PG County Executive.

12.      Defendant Barry Stanton was at all relevant times the Deputy Chief Administration Officer of Public Safety and Homeland Security for PG County.  Stanton reported directly to Alsobrooks and her office for matters relating to the police department. Stanton is sued individually and in his official capacity as Deputy Chief Administration Officer for PG County.

13.      Defendant Donnell Turner was at all relevant times the Inspector General for PG County.  Turner reported directly to Alsobrooks and her office for matters relating to the officer discipline cases involving the Plaintiffs. Turner is now a Circuit Court Judge in PG County. Turner is sued individually and in his official capacity as Inspector General for PG County.

14.     Defendant Corey Truxon was at all relevant times a police officer in the PGPD. Truxon is the Commanding Officer within the Internal Affairs division of the police department. Truxon is sued individually and in his official capacity as an officer within the police department.

15.     Defendant Jeff Ross was at all relevant times a police officer in the PGPD.  Ross serves as the Assistant Commanding Officer within the Internal Affairs division of the police department.  Ross is sued individually and in his official capacity as an officer within the police department.

16.     Defendant Robert Harvin Jr. was at all relevant times a police officer in the PGPD. Harvin served as the Acting Assistant Chief of Police of the police department. Harvin retired from the police department after the events alleged in this Complaint. Harvin is sued individually and in his official capacity as an officer within the police department.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over Plaintiff's Federal Constitutional claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiff's State Constitutional and common law claims pursuant to 28 U.S.C. § 1367(a).

18.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because multiple Defendants reside in the district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

19.     For years, the Districts III and VIII Special Assignment Teams ("SAT") were the most proactive, and productive components within the PGPD. The units consistently led the police department in firearm and narcotic seizures and arrests. SAT was tasked with saturating crime-

ridden areas to combat violent crime. Each district within PG County had its own SAT. Districts III and VIII SAT consisted of one team that was divided into two teams when District III was zoned into two districts (District III and VIII) in 2019. The Plaintiffs were all assigned to Districts III and VIII SAT, and at one point in time were all under the command of Lt. Edward Finn before the division of District III. Districts III and VIII SAT received numerous awards, accolades, and letters of accommodation for their dedicated and distinguished work in some of the most violent and dangerous areas in PG County.

20.     In or about December 2018, the Hispanic National Law Enforcement Association NCR and the United Black Police Officers Association, together with individual Hispanic and Black police officers, sued PG County, the former Chief of Police and others in the U.S. District Court. The case was styled *Hispanic Nat'l Law Enforcement Assoc. NCR et al. v. Prince George's County, et al.,* Case No.: 8:18-cv-03821 (D. Md. 2018) (the "HNLEA Lawsuit").

21.     As part of the HNLEA Lawsuit, the plaintiffs in that case filed a comprehensive analysis of police department operations authored by Michael E. Graham (the "Graham Report") to demonstrate systemic racism and use of force policies within the police department. The Graham Report was filed in the HNLEA Lawsuit on February 22, 2021 (ECF Doc. #445-13).

22.     Lt. Finn was among the officers specifically mentioned in the Graham Report. Further, District III SAT was mentioned throughout the lawsuit for use-of-force incidents during arrests and eight Plaintiffs were mentioned in the Graham Report. In those cases, Plaintiffs' actions were found to be reasonable, prudent, and within departmental policy by the police department.

23.     On February 10, 2020, another lawsuit was filed against PG County in the matter of *McMurray v. PG County, et al.,* Case No. CAL 20-05415, in the Circuit Court for PG County. The case was removed to the U.S. District Court on April 8, 2020, and styled *McMurray v. Tallant,*

6

*et al.,* 8:20-cv-00919 (D. Md. 2020) (the "McMurray Lawsuit").  The McMurray Lawsuit alleges gender discrimination, sexual assault, and retaliation stemming from alleged misconduct involving a former PG County police officer, Lt. Richard Tallant.

24.     During the HNLEA and McMurray Lawsuits, Angela Alsobrooks directed Donnell Turner to assume oversight and control of all disciplinary investigations and proceedings within the PGPD.  Turner became intimately involved in PGPD's daily operations, investigations, and disciplinary actions. Defendant Turner informed the PGPD that all disciplinary actions would need approval from the office of the County Executive prior to implementation. Turner, at the direction of Alsobrooks, encouraged and directly influenced the malicious targeting and prosecution of the Plaintiffs.

25.     During this time, James McCreary was presenting investigations directly to Turner for his input and ultimate approval.

26.     On February 25, 2021, the American Civil Liberties Union of Maryland ("ACLU") demanded that Alsobrooks terminate top PGPD officials, as well as officers mentioned in the Graham Report and HNLEA lawsuit. The ACLU also called for widespread reform to the disciplinary procedures of the PGPD. *See* [ACLU of Maryland demands top PGPD officers resign amid racism allegations (dbknews.com)](https://dbknews.com) (Last accessed 10/22/23.)

27.     Alsobrooks and Turner specifically directed McCreary and Robinson to target Plaintiffs, all members of District III SAT, a majority of which are white officers, to cover up their pattern of misconduct towards minority officers mentioned throughout the HNLEA Lawsuit. Instead of addressing departmental misconduct towards minority officers within the police department, they targeted the Plaintiffs to aid in their narrative that discipline policies within the police department were balanced during litigation of the HNLEA Lawsuit.

7

28.     On March 9, 2021, and just fifteen days after the ACLU publicly made their demands regarding the Graham Report, the Internal Affairs division allegedly received an anonymous complaint that alleged Plaintiffs Nick Agapov and Jonathan Haskett were routinely "double dipping" (being compensated by two entities at once) while working secondary employment at the Overland Gardens apartments. Less than a day later, McCreary and Robinson, acting at the direction of Alsobrooks and Turner, ordered Internal Affairs detectives to begin surveillance of these officers. *See* **Exhibit 1**.

29.     Contrary to the "anonymous" complaint, Agapov had never worked secondary employment at the Overland Gardens apartments, and Haskett worked there only on four occasions during the five-month period preceding the anonymous complaint.  *See* **Exhibit 2**.

30.     From the start, the internal investigation demonstrated a clear lack of supervision from SAT supervisors and faulty, outdated departmental policies. The lack of supervision was not just localized to Districts III and VIII SAT, but prevalent throughout many units in the police department.  However, throughout the entirety of the investigation, the Defendants never addressed these policy issues with the Plaintiffs and did not discipline or investigate supervisors for their lack of supervision of Plaintiffs because it did not fit their narrative of asserted misconduct.

31.     The PGPD's General Orders are filled with detailed supervision requirements for supervisors.  Had supervisors complied with their duties, the false allegations against the Plaintiffs would have been immediately apparent and the damages to Plaintiffs alleged herein would have been avoided.

32.     Among other things, police supervisors are required to come to work. They are also required to complete payroll accurately and monitor officers' secondary employment through departmental forms that they are supposed to direct their subordinates to complete for their review.

Internal Affairs is supposed to review these documents. Internal Affairs and PGPD supervisors did not perform these duties and they were not held accountable.

33.     Supervision throughout specialty units within PGPD was lax and unregulated. Supervision in Districts III and VIII SAT was no exception. Both Lieutenants and Sergeants were regularly not coming to work, authorizing "ghost time," which is a prevalent informal leave and reward practice vastly utilized throughout PGPD, and not adjusting payroll to accurately reflect the robust amount of schedule changes and assignments that occur regularly within the unit.

34.     Between March 13, 2021, and April 9, 2021, at the further direction of McCreary and Robinson, Internal Affairs detectives placed GPS devices on Agapov, Popielarcheck, Haskett, and Lubonski's departmentally issued vehicles. Even though Popielarcheck and Lubonski were never mentioned in the alleged "complaint," and like Agapov had never worked secondary employment at the Overland Gardens apartments, Internal Affairs personnel placed GPS devices on their vehicles anyway.

35.     As Alsobrooks and Turner directed, the investigation focused on District III SAT members who had worked part-time for Finn, Inc., a company operated by Lt. Finn to provide off-duty police services at high-crime locations throughout the County.  By contrast, the hundreds of other police officers who worked part time for Finn, Inc. were never investigated, interviewed, or charged with any misconduct.

36.     On April 2, 2021, Captain Chad Schmick, Assistant Commander of District VIII, advised the Plaintiffs assigned to District VIII SAT that the unit was being disbanded and that they were being sent back to patrol squads per the order of Robert Harvin Jr. who had received orders from "the County Executive's Office." District III SAT was advised by their command that they were also being disbanded later in April 2021.  Only Districts III and VIII were disbanded.

9

37.     On April 22, 2021, Lt. Finn was arrested by the FBI for federal tax evasion charges related to his security business, Finn, Incorporated ("Finn, Inc."). No allegations against Lt. Finn related to Finn, Inc. somehow enabling officers to double dip.

38.     Between April 23 and June 18, 2021, all the Plaintiffs were suspended by Internal Affairs personnel with the approval of Aziz and Harvin for alleged criminal misconduct related to secondary employment and double dipping. Despite twelve of the Plaintiffs not even being mentioned in the alleged complaint, they were all still suspended, and their police powers revoked.

39.     Finn, Inc. provided security services to apartment complexes and businesses inside PG County using off-duty police officers as security guards. Lt. Finn utilized the digital application "EXAKtime" for information sharing of events happening in and around the apartment complexes. The EXAKtime application was not required, regulated, nor monitored by the police department.

40.     The EXAKtime application was strictly used by Finn, Inc. The application allowed officers to generate "activity logs" to better information share with Lt. Finn. As such, Lt. Finn set the guidelines for what he expected and wanted to see in the activity logs. The police department never issued guidelines to Lt. Finn on how or when to use the application.

41.     Finn, Inc. employees were not required to use the EXAKtime application. Many employees of Finn, Inc., like Agapov, never used the EXAKtime application. Finn, Inc. utilized the EXAKtime application strictly for "information sharing" regarding incidents occurring during both regular work hours and secondary employment. He did not differentiate between the two statuses and the police department never advised him such was required. Importantly, Finn, Inc. did not use the EXAKtime application to track hours worked or for payroll functions. Even though the EXAKtime application offers software to track hours, complete payroll, and compensate

employees, Finn, Inc. declined those features. *See* https://m.youtube.com/watch?v=UWJljCZtpbY (Last accessed 10/22/2023).

42.     Lt. Finn was allowed and even encouraged to operate Finn, Inc. in PG County, and more specifically in the districts he commanded, for more than a decade. Lt. Finn was further authorized to operate Finn, Inc. in over twenty-five apartment complexes throughout the County, including apartment complexes in Districts III and VIII. During this period, PGPD engaged Ms. Elsie Jacobs, President of the Suitland Action Team, to influence local apartment complexes to hire Finn, Inc. for security services.

43.     PG County, Alsobrooks, and PGPD benefited immensely from the secondary employment of officers working for Finn, Inc. because it put additional police officers in "hot spots" of the community at no cost to the County. Over the decade preceding the wrongful prosecution of Plaintiffs alleged herein, hundreds of PGPD officers worked for Finn, Inc. The PGPD allowed Plaintiffs to work secondary employment for Finn, Inc. in their assigned districts.

44.     Throughout the investigation of Plaintiffs, Michael Elser, one of the lead detectives assigned to the SAT case, regularly stated that: "Finn, Inc. as a whole and its employees" were under investigation. However, the Plaintiffs were the only officers ever suspended and investigated during this targeted and retaliatory investigation. The Defendants intentionally and selectively sought to prosecute the Plaintiffs both administratively and criminally. Officers outside of SAT, some of whom were under the direct command of Lt. Finn and worked secondary employment for him, were never investigated or suspended.  Furthermore, PGPD replaced the suspended SAT Plaintiffs with officers who also worked secondary employment for Finn, Inc. *See* **Exhibit 3**.

45.     As pressure mounted against Alsobrooks and her bid for Governor due to the HNLEA Lawsuit, she directed her subordinates and the Internal Affairs division to become even

more reckless and desperate in their targeting of the Plaintiffs. The pressure eventually became too great and on May 26, 2021, Alsobrooks officially announced she would not be running for Governor in 2022.

46.     On June 28, 2021, the Washington Post published an article relating to Alsobrooks spending approximately $17.6 million dollars litigating the HNLEA lawsuit. That enormous amount of taxpayer money shows just how invested and motivated the County was in its frantic defense of it. *See* [Prince George?s has spent millions defending its police department against a federal discrimination lawsuit. - The Washington Post](#) (Last accessed 10/22/23).

47.     After being suspended, the Plaintiffs were notified that Aisha Braveboy, Joel Patterson, and the PG County State's Attorney's Office would no longer accept their testimony in ongoing criminal cases. As a direct result of this, dozens of active cases were dismissed.

48.     Ironically, just weeks earlier, Braveboy fired a State's Attorney's Office Investigator, retired Captain Meredith Bingley, for reporting to Braveboy her discovery of Savoy's criminal history, which included a conviction for second-degree assault for breaking a glass storm door, pointing her loaded police-issued handgun at her then-husband and his friend, and then fleeing the scene before other officers arrived.  For years, Savoy remained silent and failed to inform prosecutors of her criminal history.  Despite the revelation, Braveboy and Patterson never informed Savoy that they would no longer accept her testimony as they did with the Plaintiffs, who were never convicted of anything. *See* **Exhibit 4**.

49.     Rather than place Savoy on her "do not call" list or otherwise act to rectify the failure to disclose Savoy's criminal history over many years in her cases, which include homicide prosecutions, Braveboy expedited and approved expungement of Savoy's criminal records upon

her petition filed on May 4, 2021. When Savoy retired on December 31, 2021, Braveboy attended her retirement party and gave her an award.  *See* **Exhibit 5**.

50.     During this same period, Aziz, McCreary, Robinson, Turner, Harvin Jr., and Alsobrooks were also made aware of Savoy's criminal history.  Rather than remove Savoy from Internal Affairs, they collectively ignored her misconduct knowing that if Savoy's part in the investigation of the Plaintiffs were compromised, it would be detrimental to their ongoing HNLEA and McMurray Litigation matters.  When the Maryland Police and Corrections Training Commission contacted Internal Affairs about Savoy's conviction, they directed Robert Black to cover up the situation. *See* **Exhibit 6**.

51.     In addition to the Defendants targeting the Plaintiffs to defend themselves in litigation of the HNLEA and McMurray Lawsuits, both Savoy and Black held personal grudges towards Lt. Finn and District III and VIII SAT.  More Specifically, in or about late 2019, while Savoy was assigned to the Homicide division, and just prior to being transferred to the Internal Affairs division, her son was stopped by a member of SAT and complained that he had been mistreated.  Savoy not only caused her son to make a frivolous complaint against the officer involved, but also, she threatened Captain Bull, stating "I know how you SAT boys do."

52.     Black had a protracted hatred of Districts III and VIII SAT and a ridiculous desire to retaliate against anything associated with Lt. Finn due to past personal grudges. More specifically, Black was removed from Internal Affairs in 2010 due to over-punishing officers and alleged harassment. Upon being transferred to the bureau of patrol, Black choked Cpl. Larry Shaw during a heated argument that took place inside the clerk's office at the District IV police station. These actions caused Lt. Finn to make a complaint against Black for his conduct towards Cpl.

Shaw. Defendant Black was subsequently found guilty of unbecoming conduct in administrative proceedings and received a small punishment.

53.     In a 2021 Internal Affairs division meeting about Districts III and VIII SAT cases, Black stated: "If your goal is not to indict every single SAT member, you can leave this meeting." Current and former Internal Affairs personnel were in this meeting. Additionally, in October 2021 at the police department headquarters, Black stated to McIntosh who he observed wearing a District III SAT t-shirt: "You guys are finally fucked now!" As a supervisor in Internal Affairs, Black had direct influence over the direction of cases and used this influence to maliciously investigate the Plaintiffs due to his personal bias.

54.     On or about July 20, 2021, the parties in the HNLEA Lawsuit entered a Settlement Agreement filed in the action on July 30, 2021. (8:18-cv-03821 ECF Doc. #566-1).  Pursuant to the Settlement Agreement, the defendants agreed to pay the plaintiffs and their attorneys $5,290,000 and to revise the police department's promotion and internal disciplinary policies and to implement new General Orders within the police department.

55.     On February 7, 2022, Sgt. Victor Bernard of Internal Affairs notified Michael Elser of an interview he had conducted with a District III SAT officer on June 17, 2021, Plaintiff Brandon Farley, who was not suspended and who had no incriminating documentation against him. Farley informed Bernard that "the SAT team routinely had their schedule changed, adjusted, and altered often times without notice." Farley went on to explain that SAT supervisors regularly did not adjust these changes so that they would be reflected in payroll. He further explained how activity logs in the EXAKtime application worked and the inter-workings of Finn, Inc. Defendants Elser, McCreary, Truxon, Ross, and Robinson purposefully ignored the information learned in this interview and did not follow up on this exculpatory information when they became aware of its

existence. The Defendants did not interview anyone from Finn, Inc. to verify this information, nor did they check Plaintiffs' payroll for accuracy. *See* **Exhibit 7**.

56.     In response to this information, Elser, with Aziz, Hale, Truxon, and Ross's approval, suspended Farley to discredit the information he had provided. The information Farley provided in Sgt. Bernard's June 17, 2021 interview was, despite his suspension, the main reasons later cited for the dismissal of the criminal cases against the Plaintiffs on January 24, 2023.

57.     Elser purposefully and deliberately failed to do the basics of an investigation because it would have confirmed exculpatory evidence favorable to the Plaintiffs.  The entire investigation also lacked any supervision or oversight from the Internal Affairs chain of command including Defendants Hale, McCreary, Robinson, Truxon, and Ross. Prior Internal Affairs detectives have informed Plaintiffs that Turner and Alsobrooks were directly influencing the investigation and that they did not agree with the way McCreary and Robinson were adhering to the outside influence.

58.     Between March 1, 2022, and March 2, 2022, Elser conducted interviews with then Cpt. Rogers Massey, Lt. Jesse Spence, and Sgt. Benjamin Habershon regarding the SAT case. In Lt. Spence's interview, Elser asked: "Did officers ever submit monthly secondary employment sheets while you were there?" Lt. Spence replied: "I got to say no." Elser then asked, "Were you aware of how many hours your officers were working secondary employment at any point?" Lt. Spence replied: "No." *See* Spence Interview Audio Recording at 10:12.  In Captain Massey's interview, Elser asked, "Did you ever observe any officers submitting to you or Sergeant Habershon the monthly secondary employment sheets?" Captain Massey replied: "not that I am aware of."  *See* Massey Interview Audio Recording at 4:40.

59.     The PGPD's General Orders provide:

Officers shall submit to their Supervisor by the fifth of each month, an accounting of their previous month's [Secondary Law Enforcement Employment ("SLEE")] activities. The SLEE Monthly Activity Report will include actual dates and hours of SLEE worked. These reports shall be retained at the District/Division level for a period consistent with the requirements for retention under applicable State law. A copy shall be provided to the Chief of Police. The Internal Affairs Division's Audits and Inspection Unit shall conduct documented bi-annual audits of District/Division SLEE Monthly Activity Reports.

*See PG County General Order Manual* Volume I, Chapter 18, Pages 8-9, Secondary Employment.

60.     Not only were the SAT supervisors not consistently providing supervision to the Plaintiffs, but the Executive Command staff and Internal Affairs division chain of command, including the Defendants, were not supervising their investigators either. This is clearly evidenced by the fact that Internal Affairs never once audited the secondary employment forms that the SAT supervisors were supposed to be collecting. Now retired Deputy Chief Felipe Ordono, who was appointed to the position by Aziz, has stated that he voiced numerous times to the executive command staff that supervisors were not being held accountable for their lack of supervision.

61.     Furthermore, starting at the height of COVID-19 in 2020, Internal Affairs personnel, including McCreary, Robinson, Black, Canela, and Savoy were authorized to work their shifts from home, including overtime. This policy allowed Savoy to earn $185,265.57 in 2020 and $197, 875.62 in 2021. Savoy nearly doubled her base salary from strictly Internal Affairs casework overtime, most of which was allegedly worked at home and without any type of verification. The enormous usage of overtime while underperforming in the completion of casework led Truxon to audit and cancel overtime for Internal Affairs when he transferred there as the new Commander of the unit after McCreary was promoted to Deputy Chief.

62.     Internal Affairs personnel habitually arrive late, and leave early from their scheduled shifts despite being compensated for their entire shift. The Defendants maliciously targeted the Plaintiffs for their alleged "theft of time" while hypocritically accepting full shift pay

16

for partial shift work.  For example, they formally accused Plaintiff Cotillo of stealing one hour and one minute of County time on September 18, 2019, Plaintiff Lubonski of stealing one hour of County time on January 29, 2020, Plaintiff Haskett of stealing 59 minutes of County time on February 27, 2020, and Plaintiff Hall of stealing one hour of County time on April 10, 2020. It is ironic that the Internal Affairs division meticulously used alleged theft of time down to the minute against the Plaintiffs while simultaneously getting paid for hours never worked, *i.e.,* stealing hours from the County daily.

63.    Internal Affairs personnel continue to use informal leave practices and receive pay for complete shifts even though they do not work the entire shift. For example, Captain Christopher Badiru, an Assistant Commander in Internal Affairs, regularly advises his subordinates that he doesn't expect to see them at their desk until 0900 hours, even though their shift in payroll starts at 0700 hours. It is ironic that the "highest integrity unit" of PGPD is maliciously targeting the Plaintiffs while simultaneously participating in obvious misconduct.  McCreary and Robinson also continuously covered up misconduct involving Internal Affairs personnel while maliciously targeting the Plaintiffs without conducting the basics of an investigation in order to adhere to Alsobrooks's and Turner's directives.

64.    For example, on September 29, 2021, Savoy lost her departmentally issued laptop in the parking lot of the Maryland Live Casino. Savoy regularly played the slot machines at local casinos during her work shifts while concurrently being compensated by PGPD. A citizen found the laptop in the parking lot on September 30, 2021, and brought it to the District III station. The suspended officer assigned to the front desk, Plaintiff Christopher Hall, took custody of the laptop. He immediately notified Internal Affairs. To cover for herself, Savoy crafted a false "lost property" report that she backdated to assert she "lost" her laptop on her last scheduled day off and not while

working. Following this logic, it would have taken her three full "work" shifts to realize that her only departmentally issued laptop was missing. This obviously false report was approved by her supervisors, and she was not disciplined. *See* **Exhibits 8 and 9**.

65.     Additionally, in the SAT case, Elser did not charge Lt. Spence, Sgt. Habershon, or Captain Massey with attention to duty or failure to submit required reports. Even though SAT supervisors admitted to not supervising, not keeping track of secondary employment, and not collecting the required forms outlined by the General Order Manual, the Defendants never attempted to discipline any SAT supervisor.

66.     Elser made no attempts to verify that SAT supervisors were correctly inputting the hours worked by the Plaintiffs. The Plaintiffs were never required to complete their own payroll or even review it for accuracy with their supervisors prior to submission. Considering the volatility of the SAT schedule, along with schedule adjustments, and informal leave practices, it was nearly impossible for supervisors to accurately reflect the base hours worked by the Plaintiffs.

67.     Elser himself was tasked as a supervisor for inputting his squad's data into the payroll system. Certainly, no supervisors in the PGPD would claim that the County payroll system ("Kronos") for a specialty unit like SAT or an investigative unit could be considered an accurate depiction or reflection of the specific hours that were worked. With that personal knowledge, coupled with the information Elser learned about the SAT schedule from Lt. Spence and Captain Massey, and the informal schedule practices his own Internal Affairs unit participates in, it was an egregious misrepresentation to the State's Attorney's Office and the courts to pursue an indictment against the Plaintiffs based on that unreliable information.

68.     Between March 2022 and July 2022, at the direction of Elser, and with the approval of Truxon and Ross, Amir Canela, and other Internal Affairs detectives went to various apartment

complexes where the Plaintiffs worked secondary employment under Finn, Inc. Canela went to the District Apartments and while on the property, he encountered the property manager, Ms. Natalie Nurse, and the Assistant Property Manager, Ms. Victoria Branch. Canela attempted to interrogate Ms. Nurse and Ms. Branch in reference to the Plaintiffs and secretly used a Dictaphone to record the conversation without their permission. Ms. Branch noticed this behavior and advised Canela that she did not consent to being recorded. Ms. Nurse then confronted Canela about his behavior and Canela became visibly angry and threatened that the FBI would come after he left to serve them with subpoenas. He further made several slanderous and opinionated comments about Lt. Finn and the SAT "guys" being bad people. Ms. Nurse has further advised that the property manager at the Woods at Addison apartments contacted her and advised that Canela acted in a similar manner at her assigned apartment complex.

69.     Internal Affairs investigators also went to the Courts at Walker Mill Apartments and demanded employees divulge any "rumors or hearsay" that they had heard regarding District III and VIII SAT.  As a result of this bizarre course of conduct, the property managers sent out a companywide email advising no employees were to talk to anyone from Internal Affairs due to how hostile the interactions were. In all these interactions with property managers like the ones referenced above, Internal Affairs detectives showed their biased demeanor towards the Plaintiffs by slandering them to the public and specifically only asking for information pertaining to them while refusing to investigate the over one hundred other officers that worked as Finn, Inc. employees. The FBI never came to these properties to serve subpoenas as Canela threatened; Canela used the FBI's namesake in an attempt to intimidate citizens into providing information about the Plaintiffs.

70.     Throughout these events, Turner and Alsobrooks pushed PGPD to vigorously pursue administrative and criminal charges despite a lack of evidence against the Plaintiffs. The PGPD, including Aziz, Harvin Jr., Hale, McCreary, Robinson, Black, Truxon, Ross, and Elser dutifully followed their directives to pursue baseless criminal and administrative charges against the Plaintiffs. On August 25, 2022, a PG County Grand Jury returned an indictment against all fourteen Plaintiffs for felony and misdemeanor theft and misconduct in office charges. The Grand Jury was purposefully not afforded any opportunity to hear testimony from any employees of Finn, Inc., the apartment property managers, or the Plaintiffs' supervisors. Upon the indictment being returned, the Plaintiffs were immediately suspended without pay and benefits by Aziz and the Internal Affairs division. The Plaintiffs were left to scramble for low-paying jobs to counteract the resulting financial hardships and to find replacement health insurance for their families.

71.     When the indictment was returned, Plaintiffs not only received summonses to appear in court but also were ordered to report to Internal Affairs in relation to their suspensions arising from the indictment. Each Plaintiff received written notification from PGPD that they must notify Internal Affairs of their location during normal business hours (0800 – 1700 hours Monday through Friday) while suspended and that Plaintiff's travel during the suspension "must be approved by the Internal Affairs Division, Special Investigations Response Team." The Plaintiffs were also "ordered" to contact Psychological Services and to attend counseling sessions as directed by the PGPD's Psychological Services.  Plaintiffs were also prohibited from purchasing, receiving, or transporting any firearm or ammunition while under indictment.  All these actions served to restrict the Plaintiffs' liberty and freedom of movement pending their criminal trial.

72.     On the same day the indictment was returned, August 25, 2022, Braveboy and Patterson, together with Defendants Stanton, Aziz, Hale, and McCreary held a press conference

that was televised on local and national news networks, as well as live streamed on social media, to announce the indictment. During that televised press conference, Stanton referred to the Plaintiffs as "bad apples" among other comments. He specifically stated, "Today, we have some bad apples that need to be held accountable. Let me be clear. County Executive Angela Alsobrooks selected Chief Aziz to come here from Dallas, Texas to clean up issues such as this." These public, slanderous statements were made before any due process was given to Plaintiffs and has smeared their professional and personal reputations indefinitely.

73.     Defendants planned and scheduled this large press conference in the hopes of gaining national attention like the national attention garnered by the indictments of the Baltimore Police Department's "Gun Trace Task Force." Their calculated plan succeeded as the news of the indictment and press conference appeared throughout the country and on the internet. The Plaintiffs law enforcement careers were permanently derailed because of this unwarranted national attention that portrayed the Plaintiffs, all of whom were identified by name, in a false light.

74.     Immediately following the indictment, Elser posted a "status" on his personal Facebook page bragging about the indictment, how hard he had worked on the case, and that he was helping to keep the police department "clean."  Throughout his tenure in Internal Affairs, Elser has openly stated his disdain and negative feelings towards the Plaintiffs.

75.     Plaintiffs were wrongfully indicted on the basis of an incomplete and intentionally inadequate investigation in a case that would likely never have been brought had the investigators conveyed full and accurate facts to the prosecutors involved.

76.     Immediately after the indictments against the Plaintiffs were returned, the PGPD began requiring officers to use a digital application called "RollKall" to track secondary employment days, hours, pay rates, and locations.  This tacitly acknowledged that supervisors

previously had failed to implement department policies that likely would have avoided the indictment of the Plaintiffs in this case.

77.     Other corrective actions likewise highlight the organizational failures that precipitated the unjustified accusations in this case.  Regarding police payroll issues and reliability, the Fiscal Management Division now sends out county-wide email reminders every pay period to remind supervisors to review all timecards and payroll for accuracy with their subordinates before submission. Additionally, units such as Districts III and VIII CAT (Aziz has renamed SAT as "Community Action Team") are now required to meet with their direct supervisor before payroll is submitted to ensure their base hours, schedule changes and adjustments are correct. **Exhibit 10**.

78.     While the rest of the PGPD was afforded a fresh start with updated policies, the Plaintiffs were not given the same opportunity prior to being investigated, criminally charged, and suspended without pay and benefits.

79.     During the week of January 16, 2023, John Mckenna. Esq., an attorney for Plaintiff Hitchens, had a conversation with Mr. Nicholas Leonardi, an Assistant State's Attorney in the Public Integrity Unit. During this conversation, ASA Leonardi voiced that he was growing increasingly frustrated with the SAT case as it was rapidly crumbling and lamented that the police department had "begged" his office to seek the indictment.

80.     On January 18, 2023, Timothy Maloney, Esq., an attorney representing Plaintiff McIntosh, emailed Patterson regarding exculpatory information for the Plaintiffs. Maloney informed Patterson of several pictures that showed Lt. Spence participating in various motorcycle rides and other activities outside of his assigned sector while being compensated with regular pay and overtime from the County. Patterson and Elser planned to use Lt. Spence as their key witness

to prove the accuracy of payroll regarding the Plaintiffs. Instead of investigating and indicting Lt. Spence for blatant theft from the County, the Defendants ignored this evidence. *See* **Exhibit 11**.

81.     On January 19, 2023, Mr. Maloney and Ms. Jennifer Alexander, Esq., argued against a motion to continue filed by Patterson. Defense counsel had filed several motions *in limine* to exclude evidence obtained from PGPD payroll records, as well as the EXAKtime application. During that hearing, the Honorable ShaRon Kelsey questioned Patterson about whether the police department or the State's Attorney's Office had interviewed the bookkeeper from Finn, Inc., who could have addressed many of the issues raised in defense counsel's motions. Mr. Maloney then informed the Court:

> With respect to Ms. Finn, and Your Honor asked some very pointed questions as to when they contacted the Finn Company, I heard from Ms. Finn last night. She's going to be here today to testify. She's under subpoena. She was under subpoena to testify at the hearing two weeks ago. She's very cooperative. She's never -- she's not represented by counsel. She has -- and I investigated to see if she was. She's not. She has never heard from the State, not once. In fact, she made the observation to me yesterday that if the State just knew what I know about how this works, they would understand how what they say doesn't make sense and that the software company has absolutely nothing to do with it. That's the way we've -- and she is, frankly, I think, shocked that the State has never reached out to her. She's the timekeeper. She's the one who created all of these records that the State now keeps to get in. She would be the custodian of the records. She would be the person who maintained the business record. She's the person they have to have to get the records in. They have no one else to get these records in. And she says no one has ever contacted, not once, and there's no reason not to contact her. She'll be here later today at the one o'clock hearing to testify about all that. And she's very frank, credible and detailed with respect to what she says. And with respect to when an officer would check in and check out on the software, she'll tell you that has nothing to do with the actual dates and times of the hours worked.

*See* **Exhibit 12 (**Transcript of Proceedings 01/19/23 at 47:04—48:04.)

82.     Also in the same hearing, during which Elser and Sergeant Lidia Ramos of Internal Affairs were present, Mr. Maloney stated the following to the Court:

> Additionally, we are going to be able to show with testimony today that one of the main officers that the county intends to use in its case in chief who claims he was supervising and familiar with the time records, actually inputted very little time or had no role himself and that on at least 30 occasions where his own time would purport to show him working for the department and supervising timekeeping records that he was actually not even in the state. That he was actually in West Virginia, Virginia, Pennsylvania, on bike trips, mountain trips, and we are going to be able to show to the day and to the hour where that individual was out of state. This is one the State's lead witnesses that they've proffered on the issue of timekeeping.

See **Exhibit 12** (Transcript of Proceedings 01/19/23 at 16:23—17:10.)

83. Even though stated via email, on the record, and in front of Elser, the Defendants continuously and purposefully dismissed the notion that the Plaintiffs supervisors simply were not providing adequate supervision because it would blemish their plan of targeting and executing adverse employment actions directed at the Plaintiffs. The Defendants were so laser-focused on selectively punishing the Plaintiffs, that they were willing to ignore obvious criminal misconduct from Lt. Spence.

84. To this day, Aziz, Hale, McCreary, Truxon, Ross, and Elser have yet to suspend or even investigate Lt. Spence for his unconcealed misconduct. During the period of the investigation, Lt. Spence was obviously regularly not at work like he was required to be. Nevertheless, Lt. Spence earned $216,835.60 in 2019, $201,200.41 in 2020, $191,567.83 in 2021, and $229,693.45 in 2022 from PG County.

85. With trial in the criminal case approaching and the prosecution beginning to realize the many problems with the police department's investigation (including the lack of admissible evidence supporting the prosecution's case), the State sought to postpone the trial.  In support of his motion to postpone the criminal trial, ASA Patterson stated the following to the Court:

> Defense counsel raised issues indicating that there was another witness who would be testifying who could testify about the timekeeping procedures and

24

Officer Wormuth's name came up. I was advised to look into Officer Wormuth. Officer Wormuth had been initially investigated as being a part of this because he was in the SAT and he did work for Finn. Our records indicated from what we could see from the ExakTime and from PGPD timekeeping that there was no double dipping on the part of Officer Wormuth. He was not indicted as a result of this case. In a completely unrelated incident, Officer Wormuth has been charged. And again, Your Honor, the State doesn't have direct contact with a witness who has been charged because they do have Fifth Amendment privileges. With respect to Officer Wormuth's other investigation as a part of that other completely unrelated case, his cellphone was seized. His cellphone was downloaded, and as one might assume from a cellphone that somebody has used for years, there's a lot of text conversations in there. Now the investigation that reviewed that cellphone initially was not concerned with this investigation. When those files were reviewed, they were not reviewing them with an eye to the timekeeping procedures at PGPD. They were reviewed with an eye of a completely different subject matter, a completely different crime. As a result of the conversations that the State has had with Defense counsel as a result of the motions that Defense counsel raised in this case that we are asking for time to argue, the State asked its detective to go back through those voluminous messages and see if there is any directly probative information coming from one of the defense witnesses speaking about this specific issue, and there was. There is. That detective has been reading through these text messages and he has so far provided, and I forget the exact number, but it's somewhere in the realm of 4,800 pages of messages. And for each of them he provided specific sites where you can look within those messages to find some of the relevant information. We provided those conversations to Defense counsel and we provided the specific emails from the detective saying, hey, pay attention to these specific areas of the conversation within these greater files. The State has not yet finished reviewing that document. This all came about due to Defense's motion in this case in early January.

*See* **Exhibit 12** (Transcript of Proceedings 1/19/2023 at 42:13—44:24).

86.     Elser unlawfully without a warrant combed through the contents of Cpl. Wormuth's cell phone looking for anything he could find that might be used as evidence against the Plaintiffs. Cpl. Wormuth's personally owned cell phone was seized on March 2, 2021, pursuant to a search and seizure warrant stemming from an unrelated use of force incident that occurred on October 20, 2020. The only possible connection Cpl. Wormuth's personally owned cell phone had with the SAT case is the fact that Wormuth was also assigned to SAT with the Plaintiffs.  There were no

facts that could have supported a probable cause finding that evidence of "double dipping" would be located on Wormuth's cell phone.

87.     Elser, who has extensive knowledge involving search warrant protocol, was fully aware that a new search warrant was needed to conduct an entirely new, and exhaustive search of the contents of the cell phone.  Elser, completely lacking probable cause to believe the phone contained evidence of anything relevant to the SAT case, unlawfully searched the contents of the cell phone without attempting to obtain a warrant in hopes of finding evidence of "double dipping" to save the SAT case. The search was obviously illegal and demonstrates the extent to which the Defendants were willing to go to manufacture a case against the Plaintiffs.

88.      Truxon and Ross approved this new, warrantless search by Elser. Desperate to salvage the SAT case, Elser identified text messages he claimed supported the SAT case; however, no reasonable prosecutor could have agreed with Elser's interpretation of selected text messages, which were filled with misrepresentations and false assumptions about the text messages.

89.     Plaintiffs' defense counsel in the criminal case clearly could see the lack of a thorough investigation completed prior to the presentation of the case to the Grand Jury. In the above-mentioned continuance hearing, Ms. Alexander stated the following to the Court:

> What we have here is a rush to judgment, a fancy press conference, no due diligence, and a third request for a postponement for items that they have had or should have had and for which Judge Rattal has already granted the State leave for a postponement in the past.

*See* **Exhibit 12** (Transcript of Proceedings 1/19/2023 at 34:02-06).

90.     On January 20, 2023, at the direction of ASA Patterson, Elser reluctantly reached out to Mrs. Sherrie Finn, the bookkeeper of Finn, Inc., for an interview. During the interview, Mrs. Finn confirmed the exculpatory evidence that the Defendants had been purposefully ignoring

throughout the entirety of the investigation. Not surprisingly, just four days after Mrs. Finn was interviewed, Patterson dismissed all charges against the Plaintiffs on January 24, 2023.

91.     Prosecutors told the press new information had come to light resulting in the decision to dismiss the charges.  The entirety of this "new" information, however, was available to the Defendants prior to their presentment of the SAT case to the Grand Jury but because investigators were motivated by ill will and ulterior motives, the Plaintiffs were maliciously prosecuted despite Defendants knowing they were innocent. The criminal charges were wrongfully initiated without probable cause by Elser and the other PGPD investigators involved.

92.     The Defendants collectively ignored or did not pursue evidence they thought would prove the Plaintiffs innocence. Instead of taking an honest approach to their criminal investigation, where conclusions are drawn only after reviewing and vetting all the evidence available, the Defendants purposefully and maliciously drew their conclusions early on in the investigation to coincide with their desired outcome and intentionally ignored evidence proving Plaintiffs' innocence.

93.     The Defendants continue to pursue adverse employment actions against the Plaintiffs despite their innocence, at the direction of Alsobrooks. Aziz has stated on multiple occasions that he does not run or manage the operations of the PGPD and that all decisions and choices are made through him by Alsobrooks' office and Stanton. Aziz continually voices his frustration with Turner's involvement in PGPD's disciplinary decision-making. Even Aziz's predecessor, retired Acting Chief of Police Hector Velez, stated during his tenure that the investigation into Districts III and VIII SAT were directed and orchestrated by Alsobrooks and Turner due to the HNLEA lawsuit.

94.     Defendants Alsobrooks, Turner, and Stanton's level of involvement in the day-to-day operations of the police department is so great that in a June 1, 2023 email, Aziz inquired if permission to wear a police badge for Pride awareness had been granted by the "DCAO." By DCAO, Aziz was referencing Defendant Stanton. *See* **Exhibit 13**.

95.     Beginning in February 2023, Elser, at the direction of Hale, Truxon, and Ross, conducted hours-long interrogations of the Plaintiffs specifically tailored to the EXAKtime application and County's payroll records. Even though the criminal charges against the Plaintiffs have been dismissed, and a magnitude of exculpatory evidence has been confirmed by Internal Affairs, the Defendants continue to keep the Plaintiffs in suspended duty statuses without police powers. The Plaintiffs do not have access to county overtime programs, secondary employment, promotions, or transfers, and do not have departmentally issued vehicles. The Plaintiffs have been passed over on multiple specialty unit assignments due to their duty status and the stigma around them created by the Defendants.

96.     The treatment of the Plaintiffs is in stark contrast to similar cases controlled by the Defendants.  In March 2021, for example, an internal complaint was made about supervisors within the Criminal Investigations Division ("CID") working egregious amounts of non-CID-related overtime and not reporting to their regularly scheduled shifts while still being compensated. Unlike Plaintiffs, no CID officers were ever investigated or suspended. Another example is a 2023 complaint involving dozens of patrol officers from Division III. The officers were accused of stealing "time" from the County during regular and overtime shifts by leaving shifts early and not being in their assigned area. Even though the officers involved were allegedly being compensated for time they weren't working, none of them are currently suspended and all still have their police powers, likely because two of the involved officers are related to the Defendants. Robert Harvin

III is the son of Defendant Harvin and Lt. Charmaine Harvin, who works with Aziz, and Dionne Coppick-Harvin is the daughter of Beverly Coppock, the Executive Administrative Aide to Aziz, and the cousin of Defendant Truxon. Aziz has reportedly stated that Harvin and Coppick-Harvin are not to be disciplined by the Department regarding this matter.

97.     Additionally in 2023, Cpl. Joseph Lister, who was assigned to the Special Operations Division, National Harbor Unit, made a complaint about his direct supervisor, Sgt. Marell Smith, through his chain of command. His chain of command included Spence and Erica McCreary, who is the wife of Defendant McCreary. Lister's complaint involved Smith's absence from work but still being compensated. Instead of investigating this alleged criminal misconduct, Lister was abruptly transferred back to the Bureau of Patrol. Internal Affairs never followed up with an investigation into Sgt. Smith's misconduct and he was never suspended or disciplined.

98.     Around the same timeframe a formal complaint was sent to Aziz and Truxon involving Spence and Erica McCreary. The complaint alleged that Pfc. Kesha Nsiah-Ababio was regularly authorized "ghost time" to report late and leave early from scheduled shifts while still being compensated. The complaint alleged Spence and Erica McCreary authorized this. The involved parties were never investigated, suspended, or disciplined by Internal Affairs.

99.     Another example of the disparate treatment of the Plaintiffs involves Cpl. Clarence Black. Black was indicted in 2022 for assault and misconduct in office stemming from a traffic stop while on duty. In June of 2023, he was found not guilty. By mid-July of 2023, less than a month after his criminal case concluded, he was reinstated back to full duty by Aziz, Hale, Truxon, and Ross. The Plaintiffs have remained suspended for over nine months since their criminal charges were dismissed despite all administrative investigations and interviews being complete.

100.     On October 18, 2023, Officer Makela Outlaw smuggled another person's urine into a Concentra facility that was conducting a random drug test. This was a blatant attempt by Outlaw to deceive not only Concentra personnel, but also the PGPD. Concentra contacted Internal Affairs upon discovering that the urine was not Outlaw's. Outlaw then refused to take another drug test and was administratively suspended. Despite her unethical act, unbecoming conduct, and obvious lack of integrity, Outlaw was reinstated to full duty by Aziz and Truxon just six days later on October 26, 2023.

101.     Even the process of screening the SAT case for indictment was extremely dissimilar for the Plaintiffs as compared to others being investigated for similar alleged misconduct involving "double dipping" and theft of time. Elser, on behalf of his chain of command and the County Executive's Office, relentlessly and maliciously pursued an indictment of the Plaintiffs before any reasonable investigation was conducted. However, in cases such as those involving Lt. Justice Halsey and Lt. Daniel Hader, an indictment was not rigorously sought even though, unlike the Plaintiffs, those officers completed and approved their own payroll.  Elser purposefully and intentionally did not subpoena any employees from Finn, Inc., including Mrs. Finn, any supervisors, or "nine" cars that were tasked with doing payroll at the direction of the supervisors. This was deliberately done to portray the Plaintiffs falsely to the Grand Jury.

102.     Throughout the entirety of this investigation, the totality of the case has been proven to be misleading, inept, and lacking in both the Circuit Court for PG County, as well as in the administrative disciplinary proceedings that still linger within the PGPD. Elser, with the approval of his superiors and together with the other Defendants, produced documents, reports, and emails that were filled with misrepresentations and false statements intended not only to sway a Grand Jury's decision but also to mislead prosecutors and thereby secure a felony indictment.

103.     The Defendants were fully aware that the County payroll system, Kronos, did not accurately reflect the actual hours worked by officers in specialty units, especially the SAT. Due to operational demands, SAT had chaotic and unpredictable schedules driven by the execution of warrants and other special operations performed when needed.   It was the pattern and practice of SAT to submit payroll based on anticipated work schedules, not the actual schedules or times of day SAT officers worked. It was a rare event for the payroll to reflect modifications based on the actual hours worked.

104.     Elser knew this when he interviewed the Plaintiffs supervisors in March of 2022. He was then informed that schedules changed "all the time" and "on a day-to-day basis." Nevertheless, in a January 9, 2023 email, Elser misled ASA Patterson about how often schedules would change, stating the following: "For what it's worth Habershon, Massey, and Spence gave statements that the SAT schedule was a set schedule but would have occasional adjustments but nothing drastic." *See* **Exhibit 14**.

105.     The Defendants were also all aware of informal leave practices within the PGPD used by supervisors that ultimately render PGPD's payroll records unreliable indicators of the actual hours worked. Like Internal Affairs and many other units, supervisors in SAT regularly issued and used "ghost time" or "ghost leave." "Ghost time" allows supervisors to reward their subordinates for hard work, make up uncompensated overtime, or complete assignments demanded by the police department by providing flexibility to shifts.

106.     "Ghost time" is well documented in the PGPD and has been the subject of sworn testimony in court. For example, during the criminal trial of Cpl Jennifer Simms on March 14, 2017, Captain Michael Smith testified about the PGPD's history of using "ghost leave" to allow police officers to take leave yet have payroll processed so that it shows the officer was working.

Q    All right.  Now, briefly, you've heard in the department about a
practice or policy called "ghosting" or "ghost leave"?
A    Yes.
Q    Would you tell the Court what that is.
A    It is, from lack of better of putting it, "ghost leave" is when you allow
an employee to take time off work without actually charging their leave
bank.
Q    And that's, as long as you've been in the department, you've been
familiar with that practice that's occurred under some commands; isn't that
correct?
A    Yes.

107.    The payroll system used by the PGPD did not require officers to review or approve
their hours worked. Instead, payroll for many units within the PGPD, including SAT, was often
prepared and submitted by a senior corporal or "nine-car" on the squads who were not authorized
to submit payroll but were often ordered to by supervisors. The "nine-cars" were integral to
fulfilling the job responsibilities of supervisors who would not show up or work complete shifts.

108.    As a result, the payroll of SAT was typically prepared using base hours or strength
sheets. The Plaintiffs would either fill out their schedule adjustments on a strength sheet, text,
phone call, sticky note or simply advise them in person. However, the adjustments were rarely
ever actually entered into payroll by supervisors, or the "nine-car" as stated by Cpl. Wormuth, a
"nine-car" of District VIII SAT, in a statement to the Plaintiffs defense counsel. *See* **Exhibit 15**.

109.    An example of the unreliability of SAT payroll is demonstrated by the events of
August 14, 2020, when SAT was ordered to assist with an early morning search warrant. On that
day, their assigned schedule in "Kronos" was the evening shift that showed them working 1600-
0200 hours. However, due to the search warrant, they adjusted their tour of duty to work their shift
early in the morning. Their supervisors never entered this schedule change into Kronos to reflect
the actual hours worked by the Plaintiffs. Therefore, if the Plaintiffs worked secondary
employment after their adjusted day work tour of duty, it would appear as if they were "double

dipping" in Kronos. Supervisors' failure to adjust hours in Kronos for assignments, operations, events, and personal adjustments occurred regularly.

110.    Notwithstanding these blatant inaccuracies, Elser intentionally misled the Grand Jury by purporting that the County payroll records were an accurate reflection of the exact hours the Plaintiffs were working to secure an indictment.

111.    The county payroll system and policies were totally ill-equipped for the constantly evolving demands and changing schedules of the Plaintiffs. Aziz and Stanton acknowledged this in the August 25, 2022 press conference. However, while Aziz seemingly gave the rest of PGPD a fresh start with new policies, such as requiring supervisors to review payroll with their subordinate officers and a complete overhaul of secondary employment practices, he has sacrificed the Plaintiffs to be PG County's scapegoats for decades of defective policies, lack of supervision, and additional cannon fodder for their litigation of the HNLEA and McMurray Lawsuits.

112.    The Defendants also purposefully and intentionally misled the Grand Jury with EXAKtime data and secondary employment schedules obtained from Finn, Inc. Elser had every opportunity to subpoena Lt. Finn, or Mrs. Sherrie Finn, and the property managers of the apartment complexes to the Grand Jury, but intentionally did not subpoena them because they wanted the Grand Jury to only hear their tailored and preconceived theories about the Plaintiffs.

113.    PGPD General Orders are devoid of any policy, training, rules, or regulations involving the EXAKtime application. Plaintiffs never received any training or guidance from PGPD regarding what could and could not be entered into an activity log or how the application was intended to be used. The activity logs were not official documents or used for any official county purpose. The logs were tailored to inform Lt. Finn so he could be abreast of incidents in the districts he commanded. The information contained in them **did not** always represent that the

Plaintiffs were working secondary employment. Lt. Finn directed the Plaintiffs to include calls for service, arrests, and other incidents in logs regardless of their duty status because the logs were not used for payroll purposes. The Plaintiffs were not compensated for activity logs but for actual hours spent on the properties. They received all their guidance on what was to be included in the application from Lt. Finn.  Plaintiffs were simply complying with the orders of their supervisor, Lt. Finn, whom the police department freely let operate a monopoly of security contracts within the districts he commanded.

114.    Nevertheless, Elser concocted his own guidelines on how to interpret the activity logs within the application and how the application was used by Finn, Inc., despite never speaking with anyone from Finn, Inc. Elser used his own twisted theory to secure an indictment against the Plaintiffs. Elser, at the direction of Aziz, Hale, McCreary, Truxon, and Ross continued to investigate the Plaintiffs administratively for alleged false representations within the activity logs as evidenced by his hour-long interrogations of the Plaintiffs.

115.    PG County Code, § 18-160, provides that: "No member of the Police Department, under any circumstances, shall make any false official statement or intentional misrepresentation of facts." The State of Maryland Police Training and Standards Commission ("PTSC") statewide discipline matrix also prohibits "Intentionally making any verbal or written false statement during an official investigation or on any official agency document."

116.    Elser also knew that the Finn, Inc. secondary employment schedules were a rough draft of when the Plaintiffs were supposed to work. Nevertheless, he ignored this fact because it would be detrimental to the case. As the Commander of SAT, Lt. Finn knew that the Plaintiff's schedule was volatile and constantly changing. Therefore, he allowed them the special privilege of adjusting their secondary employment hours and days to fit their schedule. Elser was advised

34

of this fact on March 2, 2022, by Lt. Spence. Spence stated: "I do know from Finn that there was no specific time the guys had to be at part-time. From my understanding, they could show up for part-time any time they wanted…They had a lot of flexibility to work whenever they wanted." *See* Spence Interview Audio Recording at 8:50. Throughout this case, Elser maliciously tailored evidence to mislead a Grand Jury into indicting the Plaintiffs.

117.    As stated previously, the Defendants allowed Lt. Finn to operate a secondary employment monopoly throughout PG County because, for years, it benefited them. During that same time, the Defendants ordered and encouraged the Plaintiffs to conduct crime suppression and proactive patrols in these same "hot spots." This is evidenced in numerous emails and crime plans such as Operation Domino, Heatwave, and seasonal crime initiatives.

118.    An example of the various security contracts Lt. Finn was authorized to operate within Districts III and VIII is shown in **Exhibit 16**.

119.    Crime "hot spots" coincide with the areas managed by Finn, Inc. and may be visualized in **Exhibit 17**.

120.    Despite directing the Plaintiffs to focus on these "hot spot" areas, while simultaneously allowing them to work secondary employment in these same areas while off-duty, the Defendants knowingly misled prosecutors by asserting that the Plaintiffs' sharing information of ongoing crime in these areas with Lt. Finn meant that they were "double dipping."

121.    To defend their own interests in the HNLEA and McMurray Lawsuits, fueled by personal vendettas towards SAT, the Defendants tailored their investigation of "Finn, Inc. and its employees" to just fourteen SAT officers. The only officers suspended, investigated, and indicted were the Plaintiffs. To make the targeting of current Districts III and VIII SAT more apparent, three officers, Cpl. Brian Butler, Cpl. Richard Clark, and Cpl. Matthew Wofford worked secondary

employment for Finn, Inc. during the January 2019-March 2021 investigative period. These officers were never investigated, suspended, or indicted by the Defendants. All three of these officers were under the direct supervision of LT. Finn but were not assigned to SAT. Furthermore, Cpl. Ashley Russell, who was assigned to SAT during the investigative period, but temporarily assigned to the intelligence unit/FBI task force, was never investigated, or suspended despite regularly working secondary employment for Finn, Inc. *See* **Exhibits 3** and **18**.

122.    Additionally, after disbanding SAT, and during the investigative period, the Defendants replaced Plaintiffs Hitchens, Cotillo, Oliver, Cook-Spicer, Obordo, McIntosh, and Brookes' positions on SAT with officers Tucker, Groce, Wigmore, Guevara, and Clark, all of whom worked secondary employment for Finn, Inc. *See* **Exhibit 3**.

123.    As evidenced in the Finn, Inc. employee rosters, over one hundred officers worked secondary employment for Finn, Inc. during the investigative period. However, none of those officers, apart from the Plaintiffs, were ever investigated or suspended. Officer Dionne Harvin, Defendant Truxon's cousin, also worked secondary employment for Finn, Inc. during the investigative period. *See* **Exhibit 3**.

124.    Elser, at the direction of the other Defendants, misrepresented the Plaintiffs not "calling out" or notifying the dispatcher of their working secondary employment as evidence of them "double dipping." Not calling out with secondary employment is common practice throughout the PGPD and is punishable by only a written reprimand or fine. The failure of an officer to make notification of their secondary employment is not indicative of theft or criminal activity as Defendant Elser portrayed it throughout his investigation.

125.    The chart included in **Exhibit 19** compares Finn, Inc.'s monthly schedules versus the notifications by officers of their secondary employment to Public Safety Communications.

The data was collected by utilizing the Public Safety Communications notifications via RMS by searching the address of the location and the "319" code for the call. 319 is the closure code for secondary employment with Public Safety Communications.

126.    These Public Safety Communication notifications are readily and easily accessible via RMS and other departmental databases. This information was readily available to Defendants Elser, Aziz, Hale, Harvin Jr., McCreary, Robinson, Black, Savoy, Truxon, and Ross. Despite the Defendants' false public statements that all of Finn, Inc. was under investigation to conceal their targeting of the Plaintiffs, this data shows how common it was for other officers to violate the same policy regarding calling out with secondary employment. Nonetheless, no other officers were investigated, suspended, or assumed to be "double dipping" due to this violation of policy.

127.    The unconcealed pattern of ignoring lack of supervision and faulty policies throughout the police department, not following up on substantiated exculpatory evidence, and maliciously targeting the Plaintiffs for both criminal and administrative charges continued throughout the entirety of the investigation. The inaccuracy of payroll and lack of supervision was so direly unimportant to the Defendants that they ignored constant exculpatory evidence revealing Plaintiffs' innocence precisely because it was exculpatory.

128.    Through the various motions the Plaintiffs' defense counsel filed, Defendant Elser's new, warrantless search of Cpl. Wormuth's cell phone and the knowledge of the informal practice of "nine cars" completing payroll under the supervisor's log-in, it was readily apparent that Lt. Spence was often not completing payroll for his subordinate officers. However, the Defendants purposely never followed up on this information. In fact, Defendant Elser did not reach out to Cpl. Wormuth for a statement regarding payroll until June 27, 2023, long after the criminal case was presented for indictment. *See* **Exhibit 20**.

129.     Even the March 9, 2021 alleged "complaint" was more tailored towards a lack of supervision. Major Shawnee Waddy, the Commander of District III, and her Assistant Commander, then Captain Travis Rickert, first tried informal ways to remedy District III SAT's lack of supervision and the regular use of "ghost time." Numerous text messages show how prevalent "ghost time" was within SAT. Even still, the Defendants only targeted the subordinate officers who were following orders from their supervisors. Not one Defendant considered or appeared to care how prevalent "ghost time" was throughout most units in the police department.

130.     The Defendants are aware that they ignored evidence demonstrating this lack of supervision to maliciously prosecute and derail the Plaintiffs careers all to combat the HNLEA and McMurray Lawsuits and fulfill personal grudges towards District III and VIII SAT. They also ignored the fact that they allowed and encouraged Lt. Finn to freely operate a secondary employment empire within the County and simultaneously directed the Plaintiffs to conduct proactive patrols and crime suppression in these same areas.

131.     Despite this treatment, the Plaintiffs have attempted to exhaust all administrative remedies to be treated fairly and return to full duty. For example, on May 8, 2023, the Plaintiffs departmentally mailed a formal complaint against Defendant Elser, and the Internal Affairs command staff to Defendant Aziz. The Plaintiffs specifically requested the complaint be investigated by an entity outside of the PGPD due to the enormous conflict of interest that would exist if Internal Affairs were allowed to investigate themselves. In the formal complaint, the Plaintiffs detail many of the misrepresentations Defendant Elser made to prosecutors to falsely portray the facts and to convince prosecutors of wrongdoing, when in fact there was no reasonable evidence to support the indictment of the Plaintiffs.  The various misrepresentations detailed are incorporated herein.  *See* **Exhibit 21**.

132.    During the week of May 15, 2023, the Plaintiffs emailed Defendant Truxon to formally request that their duty status be restored. Three weeks later, Defendant Ross sent emails to the Plaintiffs stating that their duty status would not be changing. *See* **Exhibit 22 and 23**.

133.    The PGPD and PG County officials continue to openly admit that flawed policies directly led to the prosecution of the Plaintiffs but nevertheless continue to conduct adverse employment actions against them in retaliation for their challenges to Defendant Elser's and the other Internal Affairs investigators bias and misrepresentations.

134.    For example, on October 23, 2023, the PGPD and the newly appointed Inspector General for PG County, Anthony Bennet, held a "Town Hall" meeting regarding the new RollKall secondary employment application adopted by the police department. In the meeting, Bennet publicly made comments that the use of the application is because the County is attempting to clean up secondary employment policies. During the meeting, he stated the following: "We want to keep secondary employment cleaner and keep officers out of trouble because the worst thing you want to happen to you is being blasted on Channel 4 news because of the optics…..There is case law, an incident within this department (the SAT case) that is the reason why we are using this application. Not saying that any officers are doing wrong, it's just the perception." *See* **Exhibit 24**.

135.    During this same Town Hall meeting, Major Jordan Swonger, stated that the police department was seeing dozens of officers clocking in and out of the Rollkall application while not in their assigned area. Dozens of officers have been committing theft of time from the County by leaving their overtime assignments early and clocking out from outside of their assigned area. This issue has become so much of a problem that Sergeant Christopher Grimes sent out a departmental email on November 8, 2023 that stated the following:

Just a quick reminder that when you clock out of your job on Rollkall, that you need to be at the assignment location or in close proximity.  It will GPS ping when you clock in and clock out and if you decide to drive home to Waldorf and then clock out.  You have created a digital piece of evidence that documents your theft and the IAD case that follows should be lovely.  If you are reading this and have heard the scuttlebutt, then you should know it to be a true event.  Be smart and understand the system, you cannot work county OT then drive home to another county to go 10-7.

136.    Despite this obvious, GPS tracked, and widespread misconduct well known throughout the police department, not a single officer has been investigated, suspended, or charged for theft of time from the County. This is in stark contrast with the way the Defendants relentlessly targeted the Plaintiffs to prove theft of time from the County despite lacking any credible evidence.

137.    District III and VIII SAT's proactive work led to the recovery of hundreds of firearms and hundreds of thousands, if not millions, of dollars' worth of controlled dangerous substances from the communities of Prince George's County. The teams operated in the central region of the county and their work had a profound impact on crime throughout PG County as a whole. In fact, in the years since Districts III and VIII SAT were disbanded and the Plaintiffs were suspended, crime levels in PG County have risen to heights that have not been observed since the 1990s and early 2000s. Violent crimes such as carjacking and robberies are at an all-time high in PG County since Districts III and VIII SATs were disbanded. Furthermore, PG County has reached over one-hundred murders every year spanning from 2020 through 2023. The last recorded instance of PG County having three consecutive years of more than one-hundred murders was 2006-2008.  That is not a coincidence. PG County is currently in a crime pandemic and some of their top crime fighters remain suspended due to the Defendants' targeted and retaliatory actions.

138.    Throughout the period of investigation in this case, the Plaintiffs all received "Outstanding" ratings from their supervisors and Commanders and were praised with positive comments about their work performance and ethics as shown in their departmental Past

Performance Appraisals (PPA). The hard work of Plaintiffs throughout their careers was ruined during this entire process.

139.     Defendants Alsobrooks and Turner, instead of actually addressing departmental misconduct towards minority officers within the police department, intentionally instructed the senior police leader Defendants to target the Plaintiffs to make the police department's discipline policies appear more balanced as part of the County's enormous efforts to answer the allegations being leveled against the police department in the HNLEA and McMurray Lawsuits. Defendant Alsobrooks used the Internal Affairs division to orchestrate investigations intended to make it appear as if her office was addressing the issues of discrimination alleged in the HNLEA lawsuit and to protect her image as County Executive in furtherance of her own political campaigns and aspirations, even when it meant prosecuting innocent officers for manufactured crimes.

140.     The police department, including Defendants Aziz, Hale, Harvin Jr., McCreary, Robinson, Truxon, Ross, Black, Canela, Savoy, and Elser blindly and willingly followed the directions of the County Executive's Office to make a case by relentlessly pursuing a criminal indictment and adverse employment actions aimed at the Plaintiffs, even when it meant intentionally conducting a poor investigation, manufacturing "evidence," ignoring exculpatory evidence and the lack of credible evidence generally, and avoiding key interviews to reach a desired outcome.

141.     As a direct and proximate result of the Defendants' combined and calculated actions, the Plaintiffs were defamed and slandered on a local and national level. A Google search of their names does not reveal all the exceptional work they participated in throughout their careers, but instead leads to numerous articles about their indictments. Even though the charges were dismissed, neither the articles on the internet nor the stains to their reputations can be erased. If

the Plaintiffs decide to transfer to a different agency, apply for a different position, or leave the field of policing altogether, every background check or questionnaire will require them to disclose this investigation and indictment. This malicious investigation has completely derailed their careers and personal lives. They were left suspended without pay and benefits for months causing extreme financial hardships. The Plaintiffs were also passed over on several transfer opportunities because of their duty status and the stigma surrounding them despite being the top candidates for the positions. The Plaintiffs' reputations have been permanently tainted because of these collective actions and they will never be viewed the same by their fellow officers, their colleagues, or the citizens they all served with distinction.

142.    On May 8, 2023, all Plaintiffs provided notice of their claims alleged herein to the Honorable Rhonda L. Weaver, PG County Attorney, pursuant to Md. Courts & Jud. Proc. Code § 5-304(b).  *See* **Exhibit 25.**

COUNT I
FIRST AMENDMENT
UNLAWFUL RETALIATION
(All Plaintiffs v. Malik Aziz, Vernon Hale, Robert Harvin Jr.,
James McCreary, David Robinson, Corey Truxon, Jeff Ross,
Angela Alsobrooks, Donnell Turner, Barry Stanton, PG County, and PGPD )

143.    Plaintiffs incorporate the previous allegations in paragraphs 1 through 142 as if restated herein verbatim.

144.    Plaintiffs exercised their rights under the First Amendment to criticize the police department, senior leaders within the police department, and investigating officers within Internal Affairs as described herein.  Specifically, as set forth above, the Plaintiffs lodged a formal written complaint regarding the biased, incomplete, and unfair investigation conducted by Defendant Elser and other Defendants on May 8, 2023, and petitioned the Defendants to end the persecution of the Plaintiffs.

42

145.    The Plaintiffs' complaint concerns serious matters of public corruption and intentional, malicious misconduct by the Defendants, who are either police officers or public officials.  As such, the Plaintiffs' complaint concerns important matters of public concern.

146.    Despite all criminal charges having been dismissed on January 24, 2023, the Defendants, acting under color of state law, have retaliated by continuing to suspend the Plaintiffs and by continuing to pursue adverse employment actions against them unjustifiably without evidence or cause, other than to punish the Plaintiffs for complaining about their mistreatment as is their right under the First Amendment. "The First Amendment … 'prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett,* 139 S.Ct. 1715, 1722 (2019)(quoting *Hartman v. Moore*, 547 U. S. 250, 256 (2006)).

147.    The aforesaid retaliation is continuing at the direction of municipal policymakers, namely Defendants Angela Alsobrooks, Donnell Turner, Barry Stanton, and/or Malik Aziz. Accordingly, PG County and the PGPD have direct liability under *Monell v. Dep't of Social Services of the City of New York,* 436 U.S. 658 (1978) for the affirmative decisions of these policymaking officials.  *See Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986); *Johnson v. Balt. Police Dept.,* 2022 U.S. Dist. LEXIS 189576, *179, 2022 WL 9976525 (D. Md. Oct. 14, 2022)(citing *Carter v. Morris,* 164 F.3d 215, 218 (4th Cir. 1999)).

148.    Each of the defendants identified in this Count acted intentionally and maliciously to initiate, recommend, continue and/or approve the adverse employment actions herein described against Plaintiffs.

149.     Each of the defendants acted with malicious intent to retaliate against Plaintiffs and to punish Plaintiffs for their use of language they found offensive or unwanted, and with reckless or callous indifference to Plaintiffs' rights and to thereby harm the Plaintiffs.

COUNT II
FIFTH & FOURTEENTH AMENDMENTS
STIGMA PLUS CLAIMS
(All Plaintiffs v. All Defendants)

150.     Plaintiffs incorporate the previous allegations in paragraphs 1 through 142 as if restated herein verbatim.

151.     As more particularly described herein (and in the attached exhibits incorporated into the Complaint), the police officer defendants, namely Michael Elser, Cleo Savoy, David Robinson, James McCreary, Malik Aziz, Vernon Hale, Robert Black, Amir Canela, Corey Truxton, Jeff Ross and Robert Harvin, Jr., made, caused to be made, and/or approved of multiple false statements, misrepresentations, and false reports to PG County Prosecutors designed to convince the prosecutors that the Defendants had committed crimes of moral turpitude, including theft.

152.     Many of the statements constituted defamation *per se* because falsely accusing the Plaintiffs of committing crimes, including serious theft crimes, is defamatory on its face.  *See Caldor, Inc. v. Bowden,* 330 Md. 632, 625 A.2d 959 (1993)(false accusation of theft against an employee constituted defamation *per se*); *Montgomery Ward & Co., Inc. v. Cliser,* 267 Md. 406, 298 A.2d 16 (1972)(false accusation of theft of merchandise against customer was slander *per se*); *Shulman v. Rosenberg,* 2017 Md. App. LEXIS 1128, 2017 WL 5172642, at *9 (Md. App. Nov. 8, 2017)("We have previously found that words or statements constitute defamation *per se* when the meaning of the words impute to the plaintiff the commission of a crime.").

153.     The police officer defendants, acting under color of state law and in collusion with each other and at the direction of Defendants Alsobrooks, Turner, and Stanton intended to cause the State's Attorney's Office to indict the Plaintiffs knowing that the Plaintiffs were innocent and that the criminal case against them consisted of misrepresentations regarding the available evidence, the intentional avoidance of exculpatory and favorable evidence, an incomplete investigation that failed to interview key witnesses, and false innuendos.

154.     These actions were directed and/or encouraged by municipal policymakers, namely Defendants Angela Alsobrooks, Donnell Turner, Barry Stanton, and/or Malik Aziz.  Accordingly, PG County and the PGPD have direct liability under *Monell v. Dep't of Social Services of the City of New York,* 436 U.S. 658 (1978) for the affirmative decisions of these policymaking officials. *See Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986); *Johnson v. Balt. Police Dept.,* 2022 U.S. Dist. LEXIS 189576, *179, 2022 WL 9976525 (D. Md. Oct. 14, 2022)(citing *Carter v. Morris,* 164 F.3d 215, 218 (4th Cir. 1999)).

155.     The Defendants lacked any reasonably good faith belief that crimes were actually committed and pursued criminal charges against the Plaintiffs maliciously, with an evil motive and ill will towards the Plaintiffs, intending to cause actual harm to the Plaintiffs.

156.     The Defendants were successful in their attempts to convince prosecutors, and a grand jury, that crimes were committed when, in fact, the Defendants knew there was a lack of credible evidence to support their false claims against the Plaintiffs.

157.     Following the criminal indictments of the Plaintiffs, the Defendants gleefully held a press conference to announce to the world on television and in social media that the Plaintiffs were "bad apples" who had stolen from the police department and who were corrupt and dishonest

45

cops—identified by name during the press conference—that would be held accountable for their crimes.

158.    "The Supreme Court has acknowledged a constitutional liberty interest in one's reputation." *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021)(citing *Kerry v. Din,* 576 U.S. 86, 91-92 (2015)).  Plaintiffs' constitutionally protected liberty interests in their reputations under the Fifth and Fourteenth Amendments to the United States Constitution were severely and permanently damaged as a direct and proximate result of the corrupt and misleading investigation and subsequent news conference at which the Plaintiffs' reputations were smeared for the world to see.

159.    In addition to the public campaign to stigmatize the Plaintiffs, all of the Plaintiffs suffered and continue to suffer suspensions without pay, loss of benefits and employment opportunities, and potential administrative discharge proceedings notwithstanding that the criminal charges were long ago abandoned, and the criminal case dismissed.

COUNT III
FOURTH AMENDMENT
MALICIOUS PROSECUTION
(All Plaintiffs v. All Defendants)

160.    Plaintiffs incorporate the previous allegations in paragraphs 1 through 142 and 151 through 154 as if restated herein verbatim.

161.    A federal malicious prosecution claim "is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort."  *Hupp v. Cook,* 931 F.3d 307, 323-24 (4th Cir. 2019)(citing *Evans v. Chalmers,* 703 F.3d 636, 646 (4th Cir. 2012)(quoting *Lambert v. Williams,* 223 F.3d 257, 261 (4th Cir. 2000)). A "seizure" within the meaning of the Fourth Amendment results upon "a show of authority that restrains the liberty of a citizen." *Gallo v. City of Phila.,* 161 F.3d 217, 223 (3d Cir. 1998)(citing

*California v. Hodari D.,* 499 U.S. 621, 625-27 (1991) and *County of Sacramento v. Lewis,* 523 U.S. 833 (1998)).  A seizure may occur without physical touching of the person seized and may be of different intensities.  *See Hodari D.,* 499 U.S. at 626; *Terry v. Ohio,* 392 U.S. 1, 16-18 (1968)(holding that an investigatory stop that detains a citizen only momentarily is a seizure under the Fourth Amendment).  Even where charged defendants are released on their own personal recognizance, they remain "in custody" for purposes of the federal habeas corpus statute. *See Justices of Boston Municipal Court v. Lydon,* 466 U.S. 294, 300-01 (1984).

162.     The Defendants, acting under color of state law and intending to bring about the wrongful prosecution of the Plaintiffs, were directed and/or encouraged by municipal policymakers, namely Defendants Angela Alsobrooks, Donnell Turner, Barry Stanton, and/or Malik Aziz.  Accordingly, PG County and the PGPD have direct liability under *Monell v. Dep't of Social Services of the City of New York,* 436 U.S. 658 (1978) for the affirmative decisions of these policymaking officials.  *See Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986); *Johnson v. Balt. Police Dept.,* 2022 U.S. Dist. LEXIS 189576, *179, 2022 WL 9976525 (D. Md. Oct. 14, 2022)(citing *Carter v. Morris,* 164 F.3d 215, 218 (4th Cir. 1999))

163.     The Defendants' actions in bringing about the prosecution of Plaintiffs were committed with actual malice towards the Plaintiffs in that Defendants' actions properly may be characterized by evil or wrongful motive, an intent to injure, knowing and deliberate wrongdoing, and ill will towards the Plaintiffs.

164.     As a result of the aforesaid actions of the Defendants, on August 25, 2022, a PG County Grand Jury returned an indictment against all fourteen Plaintiffs for felony and misdemeanor theft and misconduct in office charges. When the indictments were returned, Plaintiffs not only received summonses to appear in court but also were ordered to report to the

Internal Affairs Division in relation to their suspensions without pay arising from the indictment. In addition to mandatory court appearances, each Plaintiff received written notification from the police department that they were suspended without pay and that they must notify the Internal Affairs Division of their location during normal business hours (0800 – 1700 hours Monday through Friday) while suspended and that Plaintiff's travel during the suspension "must be approved by the Internal Affairs Division, Special Investigations Response Team." The Plaintiffs were also "ordered" to contact Psychological Services and to attend counseling sessions as directed by the PGPD's Psychological Services.  Plaintiffs were also prohibited from purchasing, receiving, or transporting any firearm or ammunition while under indictment.  All these actions served to restrict the Plaintiffs' liberty and freedom of movement pending their criminal trial and therefore constituted a seizure within the meaning of the Fourth Amendment.

165.    On January 24, 2023, in the Circuit Court of Prince George's County, all charges against each of the Defendants were abandoned by the State and the criminal case was dismissed against all Plaintiffs.

166.    Thus, the criminal prosecution of the Plaintiffs terminated fully in favor of the Plaintiffs on January 24, 2023.

COUNT IV
ARTICLE 40 OF THE MARYLAND DECLARATION OF RIGHTS
UNLAWFUL RETALIATION
(All Plaintiffs v. Malik Aziz, Vernon Hale, Robert Harvin Jr., James McCreary,
David Robinson, Corey Truxon, Jeff Ross, Angela Alsobrooks, Donnell Turner,
Barry Stanton, PG County and the PGPD)

167.    Plaintiff incorporates the previous allegations in paragraphs 1 through 142 and 144 through 149 as if restated herein verbatim.

168.    Article 40 of the Maryland Declaration of Rights provides that "the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak,

write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." Article 40 is capable of a different interpretation than the First Amendment. *Clear Channel Outdoor v. Dep't of Fin.,* 472 Md. 444, 457 (2021); *State v. Brookings,* 380 Md. 345, 350 n.2 (2004)(the Maryland Supreme Court has "emphasized that, simply because a Maryland constitutional provision is *in pari materia* with the federal one . . . does not mean that the provision will always be interpreted or applied in the same manner as its federal counterpart.")(citing *Dua v. Comcast Cable,* 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002) and *DiPino v. Davis,* 354 Md. 18, 43, 729 A.2d 354, 367 (1999)("In certain contexts the contours of the State Constitutional rights are not precisely those of the Federal.").

169.    Although the First Amendment has been interpreted to protect the speech of government employees only when their speech is a matter of "public concern," the language of Article 40 "that *every citizen* of the State ought to be allowed to speak, write and publish his sentiments *on all subjects*," suggests broader application in which one's employment status is irrelevant, and protections apply not only to matters of public concern, but also to matters of private concern, *i.e.,* "*on all subjects*."  Article 40 (emphasis added).

170.    PG County and the PGPD are vicariously liable for the acts of their employees in violation of Plaintiff's State constitutional rights.

171.    Each of the defendants identified in this Count acted intentionally and maliciously to initiate, recommend, continue and/or approve the adverse employment actions herein described against Plaintiffs.  The Defendants' actions described herein were committed with actual malice towards the Plaintiffs in that Defendants' actions properly may be characterized by evil or wrongful motive, an intent to injure, knowing and deliberate wrongdoing, and ill will towards the Plaintiffs.

172.    Each of the defendants acted with malicious intent to retaliate against Plaintiffs and to punish Plaintiffs for their use of language they found offensive or unwanted, and with reckless or callous indifference to Plaintiffs' rights and to thereby harm the Plaintiffs.

COUNT V
ARTICLE 24 OF THE MARYLAND DECLARATION OF RIGHTS
STIGMA PLUS CLAIMS
(All Plaintiffs v. All Defendants)

173.    Plaintiffs incorporate the previous allegations in paragraphs 1 through 142 and 151 through 159 as if restated herein verbatim.

174.    Article 24 of the Maryland Declaration of Rights is the Maryland counterpart to the due process clauses found in the Fifth and Fourteenth Amendments to the United States Constitution and are in *pari materia* with its federal counterparts. *Allmond v. Dep't of Health & Mental Hygiene,* 448 Md. 592, 609 (2016).

175.    As more particularly described herein, the police officer defendants made, caused to be made, and/or approved of multiple false statements, misrepresentations, and false reports to PG County Prosecutors designed to convince the prosecutors that the Defendants had committed crimes of moral turpitude, including theft.

176.    The police officer defendants, acting in collusion with each other and at the direction of Defendants Alsobrooks, Turner, and Stanton intended to cause the State's Attorney's Office to indict the Plaintiffs knowing that the Plaintiffs were innocent and that the criminal case against them consisted of misrepresentations regarding the available evidence, the intentional avoidance of exculpatory and favorable evidence, an incomplete investigation that failed to interview key witnesses, and false innuendos.

177.    These actions were directed and/or encouraged by municipal policymakers, namely Defendants Angela Alsobrooks, Donnell Turner, Barry Stanton, and/or Malik Aziz.

50

178.    PG County and the PGPD are vicariously liable for the acts of their employees in violation of Plaintiff's State constitutional rights.

179.    Plaintiffs constitutionally protected liberty interests in their reputations under the Article 24 of the Maryland Declaration of Rights were severely and permanently damaged as a direct and proximate result of the corrupt and misleading investigation and subsequent news conference at which the Plaintiffs' reputations were smeared for the world to see.

180.    In addition to the public campaign to stigmatize the Plaintiffs, all of the Plaintiffs suffered and continue to suffer suspensions without pay, loss of benefits and employment opportunities, and potential administrative discharge proceedings notwithstanding that the criminal charges were long ago abandoned, and the criminal case dismissed.

COUNT VI
ARTICLE 26 OF THE MARYLAND DECLARATION OF RIGHTS
MALICIOUS PROSECUTION
(All Plaintiffs v. All Defendants)

181.    Plaintiffs incorporate the previous allegations in paragraphs 1 through 142 and 161 through 165  as if restated herein verbatim.

182.    Article 26 of the Maryland Declaration of Rights provides State Constitutional protections coextensive with the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.  *King v. State,* 434 Md. 472, 482, 76 A.3d 1035, 1041 (2013)(collecting cases).

183.    The police officer defendants, acting in collusion with each other and at the direction of Defendants Alsobrooks, Turner, and Stanton intended to cause the State's Attorney's Office to indict the Plaintiffs knowing that the Plaintiffs were innocent and that the criminal case against them consisted of misrepresentations regarding the available evidence, the intentional avoidance of exculpatory and favorable evidence, an incomplete investigation that failed to

51

interview key witnesses, false innuendos, and an overall absence of probable cause to believe the Plaintiffs had actually committed any crimes.

184.    These actions were directed and/or encouraged by municipal policymakers, namely Defendants Angela Alsobrooks, Donnell Turner, Barry Stanton, and/or Malik Aziz.

185.    PG County and the PGPD are vicariously liable for the acts of their employees in violation of Plaintiffs' State constitutional rights.

186.    The Defendants' actions in bringing about the prosecution of Plaintiffs were committed with actual malice towards the Plaintiffs in that Defendants' actions properly may be characterized by evil or wrongful motive, an intent to injure, knowing and deliberate wrongdoing, and ill will towards the Plaintiffs.

187.    As a result of the aforesaid actions of the Defendants, on August 25, 2022, a PG County Grand Jury returned an indictment against all fourteen Plaintiffs for felony and misdemeanor theft and misconduct in office charges.

188.    When the indictments were returned, Plaintiffs not only received summonses to appear in court but also were ordered to report to the Internal Affairs Division in relation to their suspensions without pay arising from the indictment.  In addition to mandatory court appearances, each Plaintiff received written notification from the police department that they were suspended without pay and that they must notify the Internal Affairs Division of their location during normal business hours (0800 – 1700 hours Monday through Friday) while suspended and that Plaintiff's travel during the suspension "must be approved by the Internal Affairs Division, Special Investigations Response Team." The Plaintiffs were also "ordered" to contact Psychological Services and to attend counseling sessions as directed by the PGPD's Psychological Services. Plaintiffs were also prohibited from transporting any firearm or ammunition while under

indictment.  All these actions served to restrict the Plaintiffs' liberty and freedom of movement pending their criminal trial and therefore constituted a seizure within the meaning of the Fourth Amendment.

189.    On January 24, 2023, in the Circuit Court of Prince George's County, all charges against each of the Defendants were abandoned by the State and the criminal case was dismissed against all Plaintiffs.

190.    Thus, the criminal prosecution of the Plaintiffs terminated fully in favor of the Plaintiffs on January 24, 2023.

COUNT VII
DEFAMATION
(All Plaintiffs v. All Defendants)

191.    Plaintiffs incorporate the previous allegations in paragraphs 1 through 142 as if restated herein verbatim.

192.    As more particularly described herein, through various police investigative reports, emails and other correspondence, the police officer defendants, namely Michael Elser, Cleo Savoy, David Robinson, James McCreary, Malik Aziz, Vernon Hale, Robert Black, Amir Canela, Corey Truxton, Jeff Ross and Robert Harvin, Jr., acting at the direction of Angela Alsobrooks and Donnell Turner made, caused to be made, and/or approved of multiple false statements, misrepresentations, and false reports to PG County Prosecutors designed to convince the prosecutors that the Defendants had committed crimes of moral turpitude, including theft from their employers.

193.    The Defendants knowingly made false and defamatory statements about Plaintiffs, whom they knew to be innocent.

194.    In the alternative, the Defendants negligently made false and defamatory statements about Plaintiffs that they should have known were inaccurate.

195.    On the same day the indictment was returned, August 25, 2022, prosecutors Braveboy and Patterson, together with Defendants Stanton, Aziz, Hale, and McCreary held a press conference that was televised on local and national news networks, as well as live streamed on social media, to announce the indictment. During that televised press conference, Defendant Barry Stanton referred to the Plaintiffs as "bad apples" among other comments. He specifically stated, "Today, we have some bad apples that need to be held accountable. Let me be clear. County Executive Angela Alsobrooks selected Chief Aziz to come here from Dallas, Texas to clean up issues such as this." These public, defamatory statements were made before any due process was given to the Plaintiffs and has damaged their professional and personal reputations indefinitely.

196.    Defendant Stanton, Aziz, Hale, and McCreary all knew or should have known the crimes alleged against the Plaintiffs and published to the world during the press conference they participated in were unfounded, unsupportable, and the product of intentional targeting of innocent officers to serve the desires of senior leadership.

197.    All Defendants acted with knowledge of the falsity of the statements and with the intention to harm the Plaintiffs' duty statuses within the police department, their chances of continued employment within the police department, and their ability to work in the future in the law enforcement profession.

198.    As a result of the false and defamatory statements published by the Defendants, the character and reputations of Plaintiffs were harmed, their standing and reputation within the law enforcement community were impaired, and they all suffered mental anguish, financial hardships, and personal humiliation.

199.    As a direct and proximate result of the false and defamatory statements alleged in this Complaint and published by the Defendants or at the direction of the Defendants, all Plaintiffs were suspended without pay, made ineligible for promotion or transfer opportunities within the police department, all faced an unwarranted criminal prosecution, all were restricted in their travel, and all suffered loss of income and benefits each would have earned associated with their employment as police officers.

COUNT VIII
MALICIOUS PROSECUTION
(All Plaintiffs v. All Defendants)

200.    Plaintiffs incorporate the previous allegations in paragraphs 1 through 142 as if restated herein verbatim.

201.    As set forth herein, the Defendants caused the Plaintiffs to be indicted on August 25, 2022 and charged with felony and misdemeanor theft and misconduct in office charges.

202.    As a result of the indictments, Plaintiffs were suspended without pay, denied pay and benefits, required to attend court proceedings to answer the criminal charges, and were restricted in their travel.  Additionally, their personal and professional reputations were destroyed.

203.    As described more fully herein, the Defendants acted with actual malice and without probable cause to believe any crimes had been committed by the Plaintiffs.  The Defendants secured indictments by making, causing to be made, and/or approving false and misleading statements to the PG County Prosecutor's Office and to the grand jury.

204.    The Defendants' actions in bringing about the prosecution of Plaintiffs were committed with actual malice towards the Plaintiffs in that Defendants' actions properly may be characterized by evil or wrongful motive, an intent to injure, knowing and deliberate wrongdoing, and ill will towards the Plaintiffs.

55

205.    On January 24, 2023, in the Circuit Court of PG County, all charges against each of the Defendants were abandoned by the State and the criminal case was dismissed against all Plaintiffs.

206.    As a direct and proximate result of the malicious prosecution of the Plaintiffs alleged in this Complaint, all Plaintiffs were suspended without pay, made ineligible for promotion or transfer opportunities within the police department, all faced an unwarranted criminal prosecution, all were restricted in their travel, and all suffered loss of income and benefits each would have earned associated with their employment as police officers.

COUNT IX
CIVIL CONSPIRACY
(All Plaintiffs v. All Defendants)

207.    Plaintiffs incorporate the previous allegations in paragraphs 1 through 142 as if restated herein verbatim.

208.    Beginning on or about March 9, 2021 and continuing to the filing of this Complaint, the Defendants Michael Elser, Cleo Savoy, David Robinson, James McCreary, Malik Aziz, Vernon Hale, Robert Black, Amir Canela, Corey Truxton, Jeff Ross, Robert Harvin, Jr., Angela Alsobrooks, Donnell Turner, and Barry Stanton agreed and conspired in and among themselves to maliciously prosecute and defame the Plaintiffs.

209.    In furtherance of the aforesaid conspiracy, the following overt acts were committed to accomplish the ends of the conspiracy, including but not limited to the following: (a) Defendants Alsobrooks and Turner directed Defendants Aziz, McCreary and Robinson to target District III/VIII SAT officers, the majority of whom were white police officers to aid the County in its response to the HNLEA lawsuit; (b) On or about March 9, 2021, Defendants McCreary and Robinson ordered Internal Affairs investigators to begin an investigation of certain District III/VIII

SAT officers; (c) On or about March 13, 2021 and April 9, 2021, Internal Affairs detectives placed GPS tracking devices on police cars operated by several District III/VIII SAT officers, some of whom had never worked for Finn, Inc.; (d) On March 16, 2021, Defendant Savoy and the Internal Affairs Division of the police department suspended Lt. Finn and Capt. Bull, both District III/VIII SAT officers; (e) On March 25, 2021, Defendants Savoy and Canela ordered multiple District III/VIII SAT officers to report to Internal Affairs, at which point the officers were deprived of their cell phones, separated, and held for several hours while each was interviewed; (f) In or about April 2021, the Defendants caused the District III/VIII SAT teams to be "disbanded;" (g) Between April 2021 and June 18, 2021, Defendants Aziz and Harvin approved the administrative suspension of all of the Plaintiffs; (h) Soon after the Plaintiffs were suspended, the Defendants caused some or all of the Plaintiffs to be black-listed by the prosecutor's office and all received notifications that County prosecutors would no longer sponsor any of the Plaintiffs as witnesses in criminal cases; (i) Defendants Aziz, McCreary, Robinson, Harvin, Turner and Alsobrooks acted to protect Defendant Savoy's position as investigator in Internal Affairs when it was revealed in 2021 that she had concealed her criminal history for years, a criminal history that included second degree assault with her police-issued firearm; (j) On June 18, 2021, Defendants Savoy and Black attempted to interview a number of the Plaintiffs: (k) In or about February 2022, Defendant Elser ignored and refused to further investigate exculpatory evidence communicated to him by Sgt Victor Bernard, another investigator within Internal Affairs; (l) In or about February 2022, Defendants Elser, Aziz, Hale, Truxton and Ross acted to suspend Plaintiff Farley, who had provided the exculpatory information to Sgt Bernard; (m) In or about March 2022, Defendant Elser conducted interviews in which he was provided exculpatory information; (n) Between March and July 2022, Defendants Elser and Canela, with the approval of Defendants Truxton and Ross,

conducted interviews at apartment complexes receiving security services from Finn, Inc.; (o) Leading up to the indictments on August 25, 2022, Defendant Elser and others gave false and misleading statements to County prosecutors, both orally and in writing; (p) On August 25, 2022, Defendants Aziz, Hale, McCreary, and Stanton participated in a press conference at which various defamatory statements were made on television and through social media; and (q) In or about January 2023, Defendant Elser conducted a warrantless search of a District III/VIII SAT officer's personal cell phone hoping to locate information to support the bases charges that had already been indicted.

210.    As a direct and proximate result of the civil conspiracy among the Defendants and the overt acts taken to achieve the purposes of the conspiracy, the Plaintiffs were maliciously prosecuted and defamed, and have suffered damages to their employment and to their personal and professional reputations.

## **DEMAND FOR JURY**

211.    Plaintiffs respectfully demand trial by jury.

## **PRAYER FOR RELIEF**

212.    Plaintiffs respectfully pray that this Court grant the following relief:

a.   Enter a judgment against the defendants declaring that the policies, practices, customs and/or decisions of policymaking officials described herein violate federal, state, and/or local laws; and

b.   Enter a judgment against the defendants enjoining them from continuing to violate Plaintiffs' rights through baseless administrative and/or disciplinary proceedings and requiring expungement of Plaintiffs' disciplinary records arising out of the facts or circumstances related to the wrongful SAT prosecution described herein; and

c.   Enter judgment against the defendants, independently, and jointly and severally when permitted by law, and in favor of plaintiffs for recovery of compensatory damages, including but not limited to lost wages, in an amount or amounts to be determined at trial; and

    d.  Enter judgment against the defendants, independently, and jointly and severally when permitted by law, and in favor of plaintiffs for recovery of punitive damages in an amount or amounts to be determined at trial; and

    e.  Include in any judgment an award of attorney's fees, expert fees, and costs pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 54; and such other relief that this Honorable Court deems to be just and proper.

December 14, 2023                            Respectfully Submitted,

                                      /s/Ray M. Shepard_____
                                      Ray M. Shepard, Bar No. 09473
                                      The Shepard Law Firm, LLC
                                      122 Riviera Drive
                                      Pasadena, Maryland 21122
                                      Phone: 410-255-0700
                                      Facsimile: 443-773-1922
                                      Email: Ray@Shepard.Law

                                      *Counsel for Plaintiffs Nick Agapov, Anthony Brooke, Matthew Cotillo, Kyle Cook-Spicer, Brandon Farley, Chris Hall, Jonathan Haskett, Joshua Hitchens, James Lubonski, John McIntosh, Matthew Obordo, Michael O'Connell, Christopher Oliver, and Travis Popielarcheck.*